# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

DOUGLASS HUSSY                     *

v.                                 *          Civil Action No. CCB-17-2841

HOUSING AUTHORITY OF BALTIMORE     *
CITY, *et al.*
                                   *
                                 ***

**Memorandum**

The plaintiff, Douglass Hussy, asserts seven claims—intentional infliction of emotional distress ("IIED"); defamation; wrongful discharge; wrongful termination; malicious prosecution; civil conspiracy; violation of the 14th Amendment; and breach of contract—against four defendants—Housing Authority of Baltimore City ("HABC"); Carla M. Walton, Chief of Human Resources of HABC;[1] Lynette Cooper; and Housing Authority Risk Retention Group ("HARRG")[2]—related to an allegation that Hussy committed sexual misconduct while serving as a maintenance worker in Baltimore public housing that resulted in, among other things, the termination of his employment and two criminal indictments. The defendants have moved for dismissal of Hussy's claim, or for summary judgment.[3] For the reasons stated below, the defendants' motion for summary judgment will be granted.

---

[1] Hussy has sued Walton in her individual and official capacity. (*See, e.g.*, Compl. at p. 16) (the "Wherefore" clause).

[2] The U.S. Department of Housing and Urban Development and Robert Hladik were originally named as defendants in this suit but have since been voluntarily dismissed.

[3] Cooper has not been served, though Hussy has filed a motion for additional time to do so. (ECF No. 20). Hussy's motion will be denied. He has not shown good cause for his failure to serve Cooper and, in any case, any effort to do so is futile because, for the reasons stated below, he cannot state a claim against Cooper.

1

## Background

Hussy was hired by HABC as a maintenance worker in April 2005. (*Id.* at ¶ 13). Hussy was promoted to a maintenance mechanic in 2006, and was moved to the Govans Manor property in 2013. (*Id.* at ¶¶ 15-16). He alleges that throughout his employment he received consistently positive performance evaluations, (*id.* at ¶¶ 17-18), and maintained membership in the American Federation of State, County, and Municipal Employees (AFL-CIO), until he was fired, (*id.* at ¶ 14).

On September 29, 2015, the Baltimore Sun reported that women living in Baltimore public housing had sued the Housing Authority of Baltimore City (HABC), and two maintenance workers, claiming that maintenance men at the City's Gilmor Homes property were demanding sexual favors in return for repairs. (Compl. at ¶ 20). The day after the Sun reported on the lawsuit filed by women in Gilmor Homes, Lynette Cooper, a resident at the city's Govans Manor property, filed a complaint alleging that Hussy "repeatedly asked [her] inappropriate questions about her undergarments." (*Id.* at ¶ 22). HABC launched an investigation into Hussy's conduct, (*id.* at ¶ 23), which was hindered by Cooper's failure to appear for an interview with HABC's internal investigations unit, (*id.* at ¶ 24). The investigation concluded in October 2015, and recommended that no action be taken against Hussy. (*Id.* at ¶¶ 24-25, 29). HABC fired Hussy on October 23, 2015, anyway, (*id.* at ¶ 32), and Hussy was eventually barred from all future employment with HUD or HABC, (*id.* at ¶ 38).

Then Hussy's legal troubles began. A few weeks after he was fired, on November 13, 2015, Hussy was added as a party to the civil suit arising from the alleged misconduct at the Gilmor Homes property. (*Id.* at ¶ 39). Hussy claims that he was never notified of this, and still was not consulted when HABC settled the case on his behalf in January 2016. (*Id.* at ¶¶ 39, 47-

48). On November 18, 2015, Hussy's first criminal trial, founded on Cooper's allegations, began—though on the first day of trial the government entered a *nolle prosequi*, allegedly because Cooper did not wish to participate in the trial and failed to attend. (*Id.* at ¶ 40). In June 2016, Hussy was indicted by a grand jury on the basis of Cooper's allegations. (*Id.* at ¶ 51). This time one criminal charge was dismissed before the trial began in March 2017, and Hussy successfully moved for judgment of acquittal after the state rested its case and Cooper again failed to attend the trial. (*Id.* at ¶ 58). These proceedings drew considerable media attention. (*Id.* at ¶ 53).

Hussy alleges that the defendants breached two contractual obligations during his legal battles. First, he alleges that the Master Agreement between HABC and AFL-CIO was violated because the agreement required that HABC give employees 24-hour notice before their discharge, which Hussy did not receive. (*Id.* at ¶¶ 31, 33).[4] He also alleges that the Housing Authority Risk Retention Group, (HARRG), denied coverage of his legal fees, claiming that his commercial liability insurance did not cover allegations concerning sexual misconduct. (*Id.* at ¶ 35).

Hussy filed suit in state court on August 18, 2017, claiming that HABC, Walton, HARRG, and Cooper committed several violations of state and federal law. The case was removed to federal court in September 2017. (Compl., ECF No. 2) The defendants now move for dismissal or for summary judgment. (ECF Nos. 5, 6). For the reasons stated below, the defendants' motion for summary judgment will be granted.[5]

---

[4] At the same time, however, Hussy alleges that he received notice of his termination on October 23, 2015, effective three days later on October 26, 2015. (Compl. at ¶ 32).

[5] Under Federal Rule of Civil Procedure 12(d), the court may treat a motion to dismiss under Rule 12(b)(6) as a motion for summary judgment if it considers "matters outside the pleadings" and each party is given notice. Here, the defendants clearly flagged in their motions that they were seeking summary judgment in the alternative, giving Hussy fair notice, and the court will consider matters outside the pleadings.

3

## Standard of Review

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphases added). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Anderson*, 477 U.S. at 247-48. The court must view the evidence in the light most favorable to the nonmoving party, *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam), and draw all reasonable inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citations omitted); *see also Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015). At the same time, the court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993)).

## Analysis

Hussy asserts seven claims—IIED; defamation; wrongful discharge; wrongful termination; malicious prosecution; civil conspiracy; violation of the 14th Amendment; and breach of contract—against the defendants. Because Hussy fails to support his claims with anything more than bare allegations, and failed to meet threshold requirements for suing HABC

and its employees, the defendants' motions for summary judgment will be granted as to each claim.

## I. Local Government Tort Claims Act

As a threshold matter, HABC and Walton argue that Hussy's claims have not met the requirements under the Local Government Tort Claims Act ("LGTCA"). The LGTCA opens local governments to "liab[ility] for any judgment against its employee[s] for damages resulting from tortious acts or omissions committed by the employee[s] within the scope of employment with the local government." MD. CODE CTS. & JUD. PROC. § 5-303(b)(1). The Act defines "local government" broadly, including all "[h]ousing authorities created under Division II of the Housing and Community Development Article." MD. CODE CTS. & JUD. PROC. § 5-301(d)(15). HABC is one such housing authority. *Mitchell v. Housing Authority of Baltimore City*, 26 A.3d 1012, 1020 (Md. App. 2011).

This waiver of immunity, however, comes with conditions. The Act caps money damages for any individual claim at $400,000, and damages across all claims arising from the same occurrence at $800,000, MD. CODE CTS. & JUD. PROC. § 5-303(a)(1), and bars the recovery of punitive damages, MD. CODE CTS. & JUD. PROC. § 5-303(c)(1). The Act also requires a plaintiff to give the local government or its employee notice of his claim within one year of the plaintiff's injury. MD. CODE CTS. & JUD. PROC. § 5-304(b)(1). Still, a court "may entertain [a] suit even though the required notice was not given" if the plaintiff moves the court to excuse its mistake for good cause, and still then only if the defendant has not "affirmatively show[n] that its defense has been prejudiced by lack of required notice." MD. CODE CTS. & JUD. PROC. § 5-304(d).

Maryland courts also excuse failure to strictly comply with the technical aspects of the LGTCA notice requirement if the plaintiff shows substantial compliance by: (1) making "some

5

effort to provide the requisite notice; (2) . . . "in fact give[s] some kind of notice; (3) the notice provides . . . requisite and timely notice of facts and circumstances giving rise to the claim; and (4) the notice fulfills the LGTCA notice requirement's purpose"—"to apprise [the] local government of its possible liability at a time when [the local government] could conduct its own investigations, *i.e.*, while the evidence was still fresh and the recollection of the witnesses was undiminished by time, sufficient to ascertain the character and extent of the injury and [the local government's] responsibility in connection with it." *Ellis v. Housing Authority of Baltimore City*, 82 A.3d 161, 342-43 (Md. 2013) (internal quotation marks omitted); *see also Faulk v. Ewing*, 808 A.2d 1262, 1272 (Md. 2002) (finding the LGTCA may be satisfied "[w]here the purpose of the notice requirements is fulfilled, but not necessarily in a manner technically compliant with all of the terms of the statute").

HABC and Walton claim that all seven of Hussy's claims—IIED; defamation; wrongful discharge; wrongful termination; malicious prosecution; civil conspiracy; and breach of contract—are deficient because Hussy failed to notify them of his intent to sue within one year of the injuries he alleges. Although they do not dispute that Hussy sent notice of his claims to HABC on April 21, 2017,[6] they insist the letter was not received by HABC until July 25, 2017. (ECF No. 6, Ex. 2). And that is a problem because the injuries Hussy alleges occurred more than one year before the letter was received, and almost all of them occurred one year before the letter was sent: (1) the injury from Cooper's allegations was suffered in September 2015; (2) the injuries from his termination and the alleged start of the civil conspiracy were suffered in October and November of 2015; (3) the injury from the start of his first criminal trial was suffered in November 2015; (4) the injury from the civil settlement was suffered in February

---

[6] Hussy also sent a letter on August 1, 2017.

6

2016; and (5) the injury from his second indictment was suffered in June 2016.[7] Thus, in the defendants' view, they should be granted summary judgment on each of Hussy's claims.

The defendants are correct that any claim against HABC or Walton that relies on Cooper's allegedly false statements, Hussy's termination, the civil settlement, or his first criminal trial are deficient because Hussy failed to fulfill the notice requirement of the LGTCA.[8] Hussy has not provided good cause for the delay in notifying the defendants of his claims, and considering a letter filed months too late as "substantial compliance" would undermine the LGTCA's purpose which is to provide the local government with timely notice of potential liability.[9] As a result, the HABC's and Walton's motion for summary judgment will be granted as to Hussy's claims for wrongful termination and civil conspiracy[10] because notice of the injuries on which they rely occurred outside the one year Hussy had to provide the defendants with notice.

Hussy's claims related to injuries arising from his second criminal indictment, however, will survive, because HABC and Walton were put on notice of this injury within one year of its happening (June 2016), so long as the court treats the operative date of notice as the day the

---

[7] Because Hussy fails to identify a particular allegedly defamatory statement, it is impossible to determine the injury date for his defamation claim, and therefore whether he satisfied the conditions of the LGTCA. It is also, for the reasons explained below, why the defendants will be granted summary judgment on the claim on independent grounds.

[8] This is true even if the court uses the date Hussy sent his letter, rather than the date HABC received it, as the date the defendants were put on notice.

[9] Precedent supports this conclusion. Maryland courts have applied *Ellis* favorably to plaintiffs in limited circumstances, and only for minor violations of the LGTCA. *See Faulk*, 808 A.2d at 1277-78 (finding substantial compliance where a plaintiff mailed a letter of notice to the defendant's insurer instead of the defendant); *Jackson v. Bd. Of Cnty. Comm'rs of Anne Arundel Cnty.*, 195 A.2d 693, 695 (Md. 1963) (finding substantial compliance where a plaintiff failed to meet a technical requirement).

[10] Hussy claims that the civil conspiracy to terminate him and subject him to criminal prosecution began after HABC's investigation concluded that no action should be taken against him. But, besides alleging that the conspiracy continued after his first criminal indictment was dismissed, there is no allegation that the conspiracy continued up to the second criminal indictment in June 2016. (Compl. at ¶ 93). Even if there were, however, HABC and Walton would be granted summary judgment as to Hussy's civil conspiracy claims for the same reasons, stated below, that the claims fail against Cooper.

7

letter was sent (April 21, 2017) rather than the day it was received (July 25, 2017).[11] And there is good reason to do so in this case. First, it is undisputed that Hussy sent the letter before the deadline and that the delay in HABC receiving it three months later was not attributable to Hussy. Second, neither HABC nor Walton has alleged that they were prejudiced by the late notice. As a result, Hussy's claims for IIED and malicious prosecution survive only insofar as they may be supported by injuries related to Hussy's second criminal indictment.

## II. Intentional Infliction of Emotional Distress

Hussy first claims that the defendants, except HARRG, are liable for intentional infliction of emotional distress (IIED)—Cooper by falsely accusing him of sexual misconduct, and HABC and Walton for participating in his second criminal proceeding. (Compl. at ¶¶ 62, 65). Because Hussy has not alleged extreme and outrageous conduct, the defendants' motion for summary judgment will be granted as to this claim.

To prove IIED in Maryland a plaintiff must allege that the defendants' conduct was (1) intentional or reckless; (2) extreme and outrageous; and (3) causally connected to the emotional distress alleged; and (4) that the plaintiff suffered severe emotional distress. *Figueiredo-Torres v. Nickel*, 584 A.2d 69, 74-75 (Md. 1991). Maryland has been "clear that liability for the tort of intentional infliction of emotional distress should be imposed sparingly." *Caldor, Inc. v. Bowden*, 625 A.2d 959, 963 (Md. 1993). As of 2010, the Maryland Court of Appeals had only recognized the existence of a sufficient IIED claim four times. *Lasater v. Guttmann*, 5 A.3d 79, 90 (Md. Ct. Spec. App. 2010); *see also Doe v. Salisbury University*, 123 F. Supp. 3d 748, 759 (D. Md. 2015).

No doubt, a false accusation, particularly a false accusation of sexual misconduct, can have terrible costs. But the tort of IIED exists only to remedy the most outrageous and

---
[11] June 2016 is the earliest Hussy may have suffered injury related to his second criminal prosecution. The trial was not held until March 16, 2017. (Compl. at ¶ 58).

8

intolerable behavior. Thus, the Maryland high court has permitted an IIED claim to proceed where a psychologist, counseling a plaintiff on his marital problems, began an affair with the plaintiff's wife, *Figueiredo-Torres*, 584 A.2d at 75-77, and where a plaintiff alleged that the defendant's sole purpose in subjecting her to a psychological examination "was to harass the [p]laintiff into abandoning her claim, or into committing suicide," *Young v. Hartford Acc. & Indem. Co*, 492 A.2d 1270, 1277-78 (Md. 1985).

Maryland courts have rejected IIED claims in equally instructive ways. In *Hines v. French*, 852 A.2d 1047 (Md. Ct. Spec. App. 2004), for example, the Maryland Court of Special Appeals affirmed dismissal of an IIED claim pressed by a plaintiff who alleged that a police officer, after pulling her over, approached her car with his gun raised, "grabbed her and threw her up against the side of [her car] and, after slamming her head into the side of the truck, while laughing," told the plaintiff "that it must have really hurt when her face hit the side of the" car because of recent surgery she had on her jaw. 852 A.2d at 1052-53 (internal quotation marks omitted). The officer then "pulled [the plaintiff's] crippled left arm up behind her back and handcuffed her hands so tightly that" the plaintiff "suffered lacerations on her wrists and hands." *Id.* at 1053. The court held that "[a]lthough such behavior, if true, was inappropriate, it is not tantamount to "atrocious[] and utterly intolerable behavior that goes beyond all possible bounds of decency." *Id.* at 1060 (internal quotation marks omitted).

Here, Hussy alleges that Cooper falsely accused him of sexual misconduct, and as a result he suffered "severe emotional distress and depression."[12] But Hussy has not alleged that he was in a special relationship with the defendants, as was present in *Figueiredo*, nor is there any indication that Cooper intended her conduct to result in harm approaching the seriousness of suicide, as in *Young*, much less indication that the other defendants intended to cause emotional

---

[12] Despite these allegations, there is no evidence in the record to support the existence of the injuries Hussy claims.

9

distress. According to the complaint, Hussy has certainly suffered, and Cooper's alleged conduct is worthy of condemnation, but her conduct is not the sort that goes beyond all possible bounds of decency. For that reason, Hussy cannot support his IIED claim against Cooper, HABC, and Walton.

### III. Defamation

Hussy next claims that HABC, Walton, and Cooper "made defamatory statements to the television media, print media, to the Office of the State's Attorney for Baltimore City, to internal channels of the Housing Authority of Baltimore City email list serves . . . labeling [Hussy] as a maintenance man that demanded sex for repairs." (Compl. at ¶ 70). Because Hussy fails to identify a single defamatory statement made by any defendant, and because even if he had done so, those statements would fall within one or more privileges, the defendants' motion for summary judgment will be granted on this claim.

To make out a claim for defamation Hussy "must allege specific facts establishing . . . (1) that the defendant made a defamatory statement to a third person, (2) that the statement was false, (3) that the defendant was legally at fault in making the statement, and (4) that the plaintiff thereby suffered harm." *Piscatelli v. Van Smith*, 35 A.3d 1140, 1147 (Md. 2012) (internal quotation marks omitted). Hussy also must "specifically allege each defamatory statement" he believes the defendants made. *Doe*, 123 F. Supp. 3d at 757-58.

Hussy's complaint merely recites the elements of a defamation claim without once identifying a single statement the defendants allegedly made. Without such information it is impossible for the court to determine whether (1) any statement was actually made and (2) whether the alleged statement met the elements of defamation under Maryland law. Because

10

Hussy "vaguely contend[s]" that the defendants made defamatory statements, he fails to provide any evidence that he was defamed. *Id.* at 758.

But even if Hussy had identified particular statements he believed to be defamatory, those statements would be protected by a qualified or conditional privilege. Under Maryland law, an otherwise defamatory statement may not produce liability if "publication of the utterance advances social policies of greater importance than the vindication of a plaintiff's reputational interest." *Gohari v. Darvish,* 767 A.2d 321, 328 (Md. 2001) (citing *Marchesi v. Franchino,* 387 A.2d 1129, 1131 (Md. 1978)).[13] Included among those social policies of greater importance than reputational harm are encouraging persons (1) "to publish materials to public officials on matters within their public responsibility; (2) . . . to publish to someone who shares a common interest, or, relatedly, to publish . . . in the interest of others; (3) [to make fair comments]; and (4) . . . to make a fair and accurate report of public proceedings." *Id.* at 329 (citation omitted). Common interests are often found between members of groups that "share similar goals or values or cooperate in a single endeavor." *Id.* (citation omitted). Here, it is clear that Hussy complains generally of published statements made to public officials within their public responsibility—he alleges statements were made concerning his behavior to the Office of the State's Attorney for Baltimore City and to the Housing Authority of Baltimore City—and between persons who share a common interest—he complains that public entities and officials communicated with other public officials likely to further their shared interest in preventing sexual misconduct in public housing. (Compl. at ¶¶ 69-74).

In sum, Hussy has not provided any evidence that he was defamed because he does not identify a single allegedly defamatory statement; even if he had, those statements would be

---

[13] Qualified or conditional privileges may be lost if the person who claims them either acted with malice or abused their privilege. *Gohari,* 767 A.2d at 327 n.13.

11

subject to a qualified or conditional privilege. The defendants' motion for summary judgment will be granted as to this claim.

IV.     Malicious Prosecution

Hussy claims that HABC, Walton, and Cooper are liable for malicious prosecution because they provided prosecutors with false, but not exculpatory, information leading to his prosecution. (Compl. at ¶¶ 85-91). To support a claim for malicious prosecution Hussy must allege that: (1) "a criminal proceeding [was] instituted or continued by the defendant against the plaintiff" (2) that was "terminat[ed] . . . in favor of the accused," (3) lacked probable cause, and (4) was motivated by malice. *Montgomery Ward v. Wilson*, 664 A.2d 916, 922 (Md. 1995).

Unlike its ordinary usage, the word "malice" for the purposes of malicious prosecution does not mean "spite, hatred, personal enmity, or a desire for revenge," *id.* at 925, but rather refers to a motivating purpose behind the prosecution that takes as its object something other than "bringing [a] party to justice," *id.* at 924. Thus, "[m]ere negligence in instituting unjustified criminal proceedings against [a] plaintiff cannot satisfy the 'malice' element" of the tort, *id.* at 925, because in such cases a defendant lacks the required mental state. Because Hussy has failed to provide any evidence that the proceeding was motived by malice, the defendants' motion for summary judgment will be granted.[14]

Lacking direct evidence, Hussy would have the court draw an inference that HABC and Walton's participation in the prosecution was motivated by an effort to rehabilitate their reputations rather than an interest in bringing Hussy to justice from three facts: (1) HABC's conclusion that Hussy did not commit sexual misconduct; (2) HABC's and Walton's subsequent

---

[14] It is also not clear from Hussy's papers that his criminal proceedings lacked probable cause. "[A]n indictment, fair upon its face, and returned by a properly constituted grand jury conclusively determines the existence of probable cause." *Gerstein v. Pugh*, 420 U.S. 103, 117 n.19 (1975). Here, it is undisputed that a grand jury indicted Hussy before his second criminal trial.

12

participation in Hussy's second prosecution; and (3) that HABC and Walton allegedly gave incomplete or inaccurate information to prosecutors. Hussy asserts, at base, that the only way HABC and Walton could participate in a criminal investigation after HABC's investigation found no evidence of misconduct, and provide incomplete or inaccurate information, is if they were motivated by malice. The evidence does not permit the court to take that leap.

Hussy's argument is undermined by the large number of more likely explanations for the defendants' conduct. To start, HABC did conclude in its internal investigation that there was no evidence of Hussy's alleged misconduct, but of course the expectation of an entity that engages in its own, non-expert, investigation is not that it sticks by its own conclusions in the face of criminal proceedings pursued by prosecutorial agencies whose job it is to unearth the truth, but to participate, if asked, in those investigations by providing whatever information it has.[15] Thus, the defendants' conduct was a matter of course, and the court need not search for an unlawful motivation to explain it.

Nor can the court infer from inaccurate or incomplete information provided by HABC and Walton that both acted maliciously. First, there is not any evidence the defendants had provided inaccurate or incomplete information to the authorities. Second, even if they had, it is not obvious that withholding exculpatory evidence would have helped either defendant's reputation. Hussy would have it that HABC and Walton were trying to secure his conviction for committing sexual misconduct in Baltimore Public Housing by providing the information that they did. But a conviction would mean that sexual misconduct was perpetrated under HABC's and Walton's stewardship, further deepening the scandal and, as a result, the damage suffered by the defendants' reputations. The defendants might have expected the opposite result from an

---

[15] Indeed, HABC concluded its investigation with the expectation that it would be reopened if additional facts or circumstances surfaced. (Compl. at ¶ 29).

13

acquittal, and thus if false or inaccurate information was provided it is much more likely the result of negligence than malice.[16] In sum, Hussy has provided no evidence that HABC and Walton were motivated by an intention to do injustice, nor can the court draw the inference Hussy asks it to. For all these reasons, the defendants' motion for summary judgment on this count will be granted.

V. Fourteenth Amendment Due Process

Hussy claims that HABC and Walton violated the Fourteenth Amendment by firing him and damaging his reputation without due process. Section one of the Fourteenth Amendment declares that no "state [shall] deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Hussy asserts a violation of both a liberty interest and a property interest.

A. Liberty Interest

The liberty interest protected by the Fourteenth Amendment includes "freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness by free men." *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 572 (1972). It also includes the right "to be heard" when "a person's good name, reputation, honor, or integrity is at stake because of what the government is doing." *Id.* at 573 (citation omitted). This right is significantly narrower than it may seem. A person only has a right to process when the government's action adversely affected her reputation and "altered her status as a matter of state law." *Paul v. Davis*, 424 U.S.

---

[16] Indeed, Hussy has not provided any evidence to suggest that if the defendants did act improperly, negligence was not to blame. And as already noted, defendants do not act maliciously if they act negligently, for the purposes of a claim of malicious prosecution.

14

693, 708-09 (1976). Aside from such cases, "any harm or injury to [the plaintiff's reputational interest], even where as here inflicted by an officer of the State, does not result in a deprivation of any liberty or property recognized by state or federal law." *Id.* at 712. Indeed, an "interest in reputation is simply one of a number which the State may protect against injury by virtue of its tort law." *Id.*

Against this legal background, Hussy asserts that the defendants violated his liberty interest by defaming him and maliciously prosecuting him. But he fails to distinguish his case from *Davis*. Here, as there, Hussy does not claim that the government's conduct altered his status under state law.[17] And here, as there, Maryland provides relief for defamation and malicious prosecution in tort, but has not recognized a constitutional interest in being free from reputational harm. *See Doe v. Dep't of Pub. Safety & Correctional Services*, 971 A.2d 975, 986 (Md. App. 2009) (analyzing a Fourteenth Amendment reputational harm claim under the *Davis* framework, and not under an independent right under state law). Hussy is free to seek relief under Maryland tort law, as he has, but the Fourteenth Amendment offers no recourse in vindicating his alleged injuries.

B. Property Interest

"[P]roperty interests protected by procedural due process extend well beyond actual ownership of real estate, chattels, or money," and include "security of interests that a person has already acquired in specific benefits." *Roth*, 408 U.S. at 571-72, 576. Still, "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it . . . . He must, instead, have a legitimate claim of entitlement to it." *Id.* at 577. As a result, "an at-will government employee . . . generally has no claim based on the Constitution at all." *Engquist v.*

---

[17] He claims that his firing resulted in his being labeled as a sex offender. Although that is how he may have been portrayed in the media, he was not labeled a sex offender as a matter of law.

15

*Oregon Dept. of Agr.*, 553 U.S. 591, 606 (2008). Further, the Supreme Court has "never held that it is a violation of the Constitution for a government employer to discharge an employee based on substantively incorrect information." *Id.*

Again Hussy fails to grapple with adverse precedent. He claims that his due process rights were violated because the defendants fired him. But he concedes he was an at-will employee and thus had no entitlement to his position. And nor could the mere fact alone that the government fired him because of incorrect information support his claim. Thus, as both *Engquist* and *Roth* instruct, the defendants' motion for summary judgment on this claim, as the others, will be granted.

VI. Breach of Contract[18]

Hussy asserts a claim against HARRG claiming that it breached its contractual obligations when it denied any responsibility to defend Hussy in his civil suit, and that MD. CODE ANN. CTS. & JUD. PROC. § 3-1701 applies because HARRG acted in bad faith.[19] Because Hussy fails to show that HARRG breached a contractual duty, the defendants' motion for summary judgment also will be granted as to this claim.

Under Maryland law, "[a] liability insurer's mistaken refusal to provide" legal defense "on the grounds that there is no . . . coverage under an insurance contract gives rise to a breach of contract action against the insurer." *Mesmer v. Md. Auto. Ins. Fund*, 725 A.2d 1053, 1058 (Md. 1999). And to state a claim for breach of contract in Maryland a plaintiff "must of necessity allege with certainty and definiteness facts showing a contractual obligation owed by the defendant to the plaintiff and a breach of that obligation by [the] defendant." *Decohen v. Capital*

---

[18] Although Hussy also asserts this claim against HABC, his arguments are focused on HARRG. Indeed, the complaint fails to identify what contract underlies HABC's alleged duty to defend him in a civil trial.
[19] The defendants concede that this case meets the threshold requirements of MD. CODE ANN. CTS. & JUD. PROC. § 3-1701, but because there is no evidence that the defendants acted in bad faith the statute is otherwise inapplicable.

16

*One, N.A.*, 703 F.3d 216, 227 (4th Cir. 2012) (citing *RRC Northeast, LLC v. BAA Maryland, Inc.*, 994 A.2d 430, 440 (Md. 2010). Still, "in Maryland, an insurer's duty to defend should be construed liberally in favor of the policyholder." *All Class Const., LLC v. Mut. Ben. Ins. Co.*, 3 F. Supp. 3d 409, 419 (D. Md. 2014) (internal quotation marks omitted).

For all of Hussy's insistence that HARRG breached its contract and acted in bad faith, he fails to tie his argument to a single provision of the insurance contract. HARRG does, however. It asserts that Hussy's insurance coverage applied only to "acts within the scope of [Hussy's] employment," and even then only if the act did not give rise to liability for "[s]exual abuse or mistreatment, molestation, sexual harassment or sexual assault." (ECF No. 5, Ex. 3 p. 8).[20] It is undisputed that Hussy was accused of sexual misconduct, and that the civil trial was set to determine Hussy's, and his fellow defendants', liability based on that and similar accusations. Contrary to Hussy's arguments, all available evidence indicates that HARRG complied with its contractual obligations.

Hussy's claim that HARRG acted in bad faith also fails. He asserts that: (1) HARRG failed to investigate and review relevant materials; (2) its decision not to defend him was arbitrary and capricious; and (3) that it failed to communicate its denial of coverage to him. Each of these allegations is undermined by undisputed evidence. Far from arbitrary and capricious, or based on a failure to investigate and review relevant materials, HARRG sent Hussy two detailed letters—the first was sent when Hussy was added to the civil suit, and the second after the civil complaint was amended, the shortest of which was twelve pages—that described the law suit and the applicable contract provisions, and included HARRG's analysis of those provisions. And in case Hussy disagreed with HARRG's conclusions, each letter ended by

---

[20] HARRG also identified several other provisions of its insurance contract with Hussy that supported denying him coverage. (*See generally* ECF No. 5, Exs. 2, 3).

17

asking Hussy to "[p]lease let [it] know if [he] disagree[d] with [its] denial of coverage or would like [it] to consider additional information or documentation." (*See, e.g.*, ECF No. 5, Ex. A p. 11).[21]

HARRG's attempt to reach Hussy was similarly sufficient. It sent both letters by certified mail to the care of HABC, Hussy's former employer. Even assuming that HABC failed to turn over the letters to Hussy, it is not at all clear how HARRG should be held liable for that. And still more, Hussy does not allege that he was prejudiced by the delay—though it would be hard for him to do so for, as already stated, Hussy did not have a right to coverage. Besides Hussy's unfounded claims, there is nothing in the record to suggest either that HARRG mistakenly or in bad faith denied Hussy coverage, or that HARRG acted unreasonably or in bad faith in sending its letters denying Hussy coverage to his employer. Accordingly, the defendant's motion for summary judgment will be granted as to this claim also.

    VII.    Civil Conspiracy and Conspiracy to Interfere with Civil Rights

Last, Hussy alleges that Cooper is liable for civil conspiracy under Maryland law, and conspiracy to interfere with his civil rights under 42 U.S.C. § 1985(3).

A. Civil Conspiracy

Civil conspiracy in Maryland is constituted by "a combination of two or more persons by an agreement or understanding to accomplish an unlawful act or to use unlawful means to accomplish an unlawful act not in itself illegal, with the further requirement that the act or means employed must result in damages to the plaintiff." *Shenker v. Laureate Educ., Inc.*, 983 A.2d 408, 428 (Md. 2009). "[C]onspiracy is not a separate tort capable of independently sustaining an award of damages in the absence of other tortious injury to the plaintiff." *Marshall v. James B.*

---

[21] More still, HARRG worked to settle the civil suit on Hussy's behalf despite the fact that it did not have to provide him coverage. (*See* Compl. at ¶ 48; HARRG's Mot., ECF No. 5, p. 3).

*Nutter & Co.*, 758 F.3d 537, 541 (4th Cir. 2014) (internal quotation marks omitted). In this case, Hussy claims that each of his other tort claims independently supports his civil conspiracy claim. (Compl. at ¶¶ 92-99). But, for the reasons already stated, the defendants will be granted summary judgment on each one of those claims. As a result, the defendants' motion for summary judgment also will be granted on this claim.

B. Conspiracy to Interfere with Civil Rights

A plaintiff may bring a claim under 42 U.S.C. § 1985 if he shows: "(1) a conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy." *Thomas v. The Salvation Army Southern Territory*, 841 F.3d 632, 637 (4th Cir. 2016). Unsupported allegations of a conspiracy "are not enough for a claim to proceed." *Id.*

Hussy does not allege, let alone provide evidence, that the defendants were motivated by a class-based discriminatory intent, and, as a result, he cannot carry a claim for conspiracy to interfere with his civil rights. The defendants' motion for summary judgment will be granted as to this claim.

## Conclusion

For the reasons stated above, the defendants' motion for summary judgment will be granted. A separate order follows.

4/24/18
Date

Catherine C. Blake
United States District Judge

19